Filed 3/23/22  In re Z.N. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re Z.N. et al., Persons Coming Under the Juvenile Court Law. | B312636 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.B., <br><br> Defendant and Appellant. | Los Angeles County Super. Ct. No. 20CCJP04684A-C |

APPEAL from an order of the Superior Court of Los Angeles County, Hernan D. Vera, Judge. Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

**INTRODUCTION**

J.B. (mother) challenges the juvenile court's order at the six-month review hearing declining to return her children to her custody. Mother argues (1) substantial evidence did not support the juvenile court's finding that the children would be at substantial risk if returned to mother; (2) the juvenile court failed to specify the factual basis for its conclusion that the return of the children to mother would be detrimental; and (3) the juvenile court lacked sufficient evidence for its finding that reasonable services have been provided or offered to mother. As discussed below, we conclude mother's contentions are without merit. Accordingly, we affirm.

**BACKGROUND**

Mother and S.N. (father) are the parents of Z.N., who was born in November 2017. Mother and A.S. are the parents of Z.N.'s two older half-sisters, M.S. and V.S., born in January 2012 and December 2012, respectively. Mother is the sole appellant.

To summarize the earlier proceedings in this dependency case, we quote a lengthy excerpt from our earlier unpublished opinion (*In re Z.N.* (Aug. 24, 2021, B309358) [nonpub. opn.].) "At the time this case was initiated, mother . . . resided with all three of her children and her boyfriend at the time, R.P. . . . Mother reported that per a family law court order, she had primary physical custody of Z.N. subject to monthly visits by father on weekends[.]" (*In re Z.N., supra,* B309358.)

"On September 1, 2020, mother took Z.N. to the emergency room after observing Z.N. walking with a limp. Mother was concerned that Z.N. had been injured during a visit with father the weekend before, as Z.N. was not limping prior to the visit. She stated that while she noticed Z.N. 'had some bruising to her bottom,' she 'did not think anything of the bruises' because Z.N. reportedly is 'clumsy,' 'falls often,' and 'bruises easily' 'when she falls or plays.'" (*In re Z.N., supra,* B309358.)

"While examining Z.N., the emergency room doctor observed the following: (1) five bruises along the side of Z.N.'s right thigh ranging in size and at different stages of healing; (2) faint bruises on her right buttocks; (3) two small bruises on Z.N.'s left thigh; and (4) a bruise measuring approximately three centimeters on the right side of Z.N.'s genital area, which 'extend[ed] from [the] inner thigh to [the] vaginal wall[.]' The doctor noted the bruises were 'concerning' and might be indicative of non-accidental trauma." (*In re Z.N., supra,* B309358.)

"Due to mother's reports regarding Z.N.'s history of bruising easily, doctors conducted a bone survey, as well as pediatric hematology and oncology tests, to determine whether there was a physiological cause for her current bruises. The doctors who reviewed Z.N.'s test results determined there did not appear to be a physiological reason for her bruises, and suspected they were caused by non-accidental trauma." (*In re Z.N., supra,* B309358.)

"Subsequently, child abuse pediatrician Corey J. Rood, M.D., examined Z.N. He observed she had '[n]umerous large coalescing bruises' on her right thigh 'extending from near the knee to the hip,' multiple bruises on her left thigh, and bruises in

3

her genital area. Dr. Rood opined '[t]he accidental trauma history mother provide[d] of [Z.N.] being an active toddler who jumps, plays, and falls onto her buttocks and legs does not adequately explain the soft tissue bruising' observed on Z.N.'s thighs and genital area. He also noted mother reported Z.N. 'had a subconjunctival hemorrhage' in one of her eyes the week before due to vomiting. Dr. Rood stated that, in children, those types of hemorrhages 'are not caused by vomiting and are indicative of accidental [or] inflicted blunt force trauma or asphyxiation.' He also found '[t]here is no accidental trauma history to explain [Z.N.'s] subconjunctival hemorrhage.'" (*In re Z.N., supra,* B309358.)

"Dr. Rood concluded '[t]he constellation of [Z.N.'s] current and past injuries, in the[ ] locations [observed], is most consistent with inflicted trauma[.]'[1] He opined that if Z.N. were 'returned to the caregiver who inflicted these injuries, she is at increased risk of further injury and even death.'" (*In re Z.N., supra,* B309358.)

"The results of Z.N.'s hospital visit prompted a referral to the Department of Children and Family Services (Department), which was received on September 2, 2020. Given the nature of Z.N.'s injuries, the Department detained the children from mother and placed them into protective custody on the same day." (*In re Z.N., supra,* B309358.)

"On the evening of the children's detention, the Department contacted father by phone and notified him of its investigation into the referral pertaining to Z.N. Father denied hurting Z.N., and reported that last Friday evening, after he had picked her up for his most recent visit, he observed Z.N. 'had

---

[1] Dr. Rood noted "there are no exam findings or disclosures [giving rise to] concern[s] for sexual abuse."

4

bruises and scratches to [her] legs.’ He related he had texted mother to report his concerns about Z.N.’s injuries, and to inform her that he had taken pictures of them. Father stated that in response, mother ‘got mad . . . and accused [him] of blaming her.’ He also mentioned that a few weeks before, Z.N. ‘had a scratch to her eye[.]’” (*In re Z.N., supra,* B309358.)

“On September 3, 2020, the children’s foster mother contacted the Department to report ‘she had a very concerning talk with [V.S.]’ The foster mother reported V.S. ‘said she had a secret to tell and she wanted [the foster mother] to promise she would not tell anyone because her mom said if [V.S.] told they would take them away for a long time.’ Subsequently, V.S. told ‘her it was her mom and her mom’s boyfriend who hit [Z.N.]’ The foster mother related V.S. ‘disclosed she saw her mom throw [Z.N.] [onto] the wall and would hold her by both arms and shake her very hard.’ V.S. then reported that mother’s boyfriend, R.P., ‘would hold [Z.N.] by the ankles upside down and shake [her] hard,’ and that he had ‘put[ ] a pillow over [Z.N.’s] face to keep her from screaming.’ The foster mother stated V.S. ‘was scared to report because her mom told her if she said anything everyone was going to get in trouble.’ [¶ . . . ¶] Additionally, V.S. was interviewed by a Department social worker in October 2020. V.S. reported R.P. “‘would hit the baby [Z.N.] in front of [her] mom.”’” (*In re Z.N., supra,* B309358.)

“Following its investigation, the Department filed a petition alleging Z.N. fell within the purview of Welfare and Institutions

Code[2] section 300, subdivisions (a), (b)(1), and (e).[3] The petition alleged that the injuries to Z.N.'s legs and genital area observed in the medical examinations discussed above, as well as the recent subconjunctival hemorrhage in her eye, were 'consistent with inflicted trauma[,]' and that her parents 'gave no explanations of how [she] sustained [them].' The petition further alleged Z.N.'s injuries 'would not ordinarily occur except as the result of deliberate, unreasonable and neglectful acts by [her] parents[,]' which 'create[d] a detrimental home environment' and placed her at serious risk of physical harm." (*In re Z.N., supra,* B309358.)

"On November 5, 2020, the Department filed an amended petition, in which the allegations pertaining to father and those brought under section 300, subdivision (e) were stricken. At a hearing held on the same day, mother pled no contest to the amended petition. The juvenile court accepted her plea, sustained the amended petition as pled, and declared [the children] dependent[s] of the court." (*In re Z.N., supra,* B309358.)

At the subsequent dispositional hearing, the juvenile court removed all three children from mother, ordered M.S. and V.S. in suitable placement under the Department's supervision, and placed Z.N. with father. Mother was granted family reunification services and monitored visitation with the children. Mother's court-ordered case plan required her to complete a parenting

---

[2] All subsequent statutory references are to the Welfare and Institutions Code.

[3] The petition was also filed on behalf of V.S. and M.S., and alleged the conduct giving rise to Z.N.'s injuries also placed her half-sisters at serious risk of physical harm.

6

class and to participate in individual counseling to address child protection, domestic violence, and other case issues. The court set the matter for a six-month review hearing on May 17, 2021.

In preparation of the six-month review hearing, the Department prepared a status review report. According to the report mother notified the Department after the disposition hearing that she was receiving individual counseling services from Robert Howard. Because mother failed to complete a release of information, the Department initially struggled to contact Howard. Once in contact with the Department, Howard stated he met with mother three times between August and December 2020. Further, he had informed mother he did not provide traditional individual counseling and would not complete progress reports for the court. Moreover, he had told mother his focus was on stress management and minor anxiety; he therefore could not address mother's case issues regarding child safety. The Department advised mother to seek individual counseling elsewhere and provided her a list of approved service providers.

Three months later, in mid-March 2021, Mother met with Dany Man for an intake meeting and one individual counseling session. Because she could not provide counseling services that would meet mother's needs, Man advised mother to receive services from a licensed therapist.

Approximately one month later, mother informed the Department she had enrolled in services with John Miyabe, a Licensed Marriage and Family Therapist. At the time the Department prepared the six-month status review report, Miyabe had not provided feedback or a progress report on mother. He did, however, provide a letter for mother shortly before the hearing. Mother included the letter in her exhibits and the juvenile court

admitted it into evidence. Per the letter, Miyabe reported he had five sessions with Mother between April and May 2021, and he was scheduled to meet with mother for another session again in May.

At the Section 364 and 366.21, subdivision (e) six-month review hearings, the juvenile court authorized mother to spend the night at the maternal grandparents' home and authorized her to move in with maternal grandparents and minors M.S. and V.S. Moreover, the juvenile court allowed unmonitored contact in the grandparents' home, including overnights and weekends. Outside the grandparents' home, mother's visits were to be monitored. The juvenile court advised this was not an order releasing the children to mother's custody. Instead, the juvenile court clarified it was an order for "light monitored, unmonitored" visitation. M.S. and V.S. remained in the custody of the grandparents. The court ordered mother to continue her individual counseling. Z.N. remained in the custody of her father, with monitored visits for mother; the Department had discretion to liberalize.

The juvenile court found the progress of the parents had been substantial and found the Department had provided or offered reasonable services. The juvenile court also found, however, continued jurisdiction for the children was necessary because conditions continued to exist that would justify jurisdiction or were likely to exist if supervision were withdrawn. Moreover, the juvenile court found return of the children to the physical custody of mother would create a substantial risk of detriment to each child. It ordered the Department to provide, and the parents to continue their participation in, services previously ordered. Additionally, the juvenile court set a progress

hearing for August 18, 2021, and a further six-month review for November 17, 2021. Mother filed a timely notice of appeal.

## DISCUSSION

### I. Substantial Evidence Supports the Juvenile Court's Findings Under Section 366.21, Subdivision (e)

First, mother argues substantial evidence did not support the juvenile court's findings and orders that the children would be at substantial risk of detriment if returned to her. (§ 366.21, subd. (e)(1).)

### A. Applicable Principles and Standard of Review

At the six-month review hearing, the juvenile court must return the child to his or her parent's custody unless it finds by a preponderance of the evidence that return would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).) The Department bears the burden of proving risk of detriment. (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.)

Whether the placement of a child with her parent would be detrimental is to be examined by looking at the totality of the circumstances. (*See A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1059 ["[d]etriment can be shown many different ways"].) Relevant circumstances include (1) the relevant parent's "[c]ompliance with the reunification plan" (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704 (*Constance K.*)), and[,] (2) the "effect . . . return [to the parent's custody] would have on the child" (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 901) as well as "the manner in which the parent has

9

conducted . . . herself in relation to a minor in the past" (*Constance K.*, at p. 705).

We review a juvenile court's finding that the risk of such detriment exists for substantial evidence. (*In re E.D.* (2013) 217 Cal.App.4th 960, 965-966.) Substantial evidence is evidence that is of "'reasonable, credible, and of solid value'" such that a reasonable trier of fact could make such findings. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924.) The appealing party "bear[s] the burden to show there was no evidence of a sufficiently substantial nature to support those findings and orders. [Citation.] We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court and review the record in the light most favorable to the court's determinations; we do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the trial court's findings. [Citation.] Thus, we do not consider whether there is evidence from which the juvenile court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw. [Citation.]." (*In re M.R.* (2017) 8 Cal.App.5th 101, 108.)

### B. Analysis

In support of her contention, mother cites several cases standing for the proposition that a parent's perceived "lack of insight" despite participation in services is not substantial evidence supporting a detriment finding precluding the return of a child at a section 366.22 permanency review hearing. (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738 (*Blanca P.*); *Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856 (*Georgeanne G.*); *M.G. v. Superior Court* (2020) 46 Cal.App.5th 646 (*M.G.*). Comparing the present case to these cases, mother

contends the Department's and the juvenile court's reliance on mother's "lack of insight" into the problems that led to removal did not constitute substantial evidence of a substantial danger.

The cases mother cites are distinguishable. In *Blanca P.*, the juvenile court erred by assuming, without proof, that the father had engaged in child molestation. (*Blanca P., supra*, 45 Cal.App.4th at p. 1747.) The Department and mother's therapist opined mother had failed to "internalize" what she learned in parenting classes because she refused to believe father was a child molester. (*Id.* at p. 1751.) There, mother had endured "countless hours of therapy" but nevertheless was denied relief based on an arbitrary interpretation of what she gleaned from that therapy. (*Ibid.*)

In *Georgeanne G.*, the detriment finding based on mother's "lack of insight" was grounded on mother's relationship with a man who had a prior forcible rape conviction against his ex-wife. (*Georgeanne G., supra*, 53 Cal.App.5th at pp. 859, 861, 863–864.) Mother had completed her case plan, including domestic violence services based on her prior domestic violence relationship with father and had no domestic violence incidents with the boyfriend in the 22 months they lived together. (*Id.* at pp. 862, 868.) The appellate court found substantial evidence did not support the finding of detriment because there was no evidence of risk to the child based on mother's relationship with the boyfriend. (*Id.* at pp. 868–869.)

Finally, in *M.G.*, where the children had been removed due to domestic violence between the parents, the juvenile court's detriment finding, based on father's lack of insight because he and mother "continued to 'linger in the relationship,'" was not supported by substantial evidence where there was no evidence

the parents were in a relationship, and they had completed their case plans. (*M.G., supra*, 46 Cal.App.5th at p. 662.)

These cases stand for the proposition that though a parent's lack of insight or internalization despite their participation in services can be considered by a juvenile court in making a detriment finding, "before the qualitative evaluation as to the effectiveness of counseling, therapy or parenting classes can constitute sufficient evidence to support a finding of detriment, the psychologist's or social worker's opinion must be 'based on *evidence* rather than an emotional response.'" (*Georgeanne G., supra*, 53 Cal.App.5th at p. 867, citing *Blanca P., supra*, 45 Cal.App.4th at p. 1750.)

The cases mother cites are not controlling because in none of these cases did the parents deny a problem altogether. In contrast, here the Department reported it attempted to speak to mother on numerous occasions regarding the safety concerns that brought mother to the attention of the Department and the juvenile court. When discussing the incidents of Z.N.'s physical abuse, however, mother either stayed quiet and provided no feedback or deflected the questioning by stating she was a domestic violence victim and as a result, struggled to speak up.

Moreover, the record does not support mother's contention that the juvenile court relied on the Department's opinion that mother "lacked insight." Instead, the record shows the juvenile court took the matter under submission to review the record. Included in the record was a letter from mother's therapist, Miyabe, stating mother was *beginning* to see the practical implications of co-parenting. Moreover, he reported mother seemed to be seeing the efficiency of co-parenting and being a positive presence in her children's lives. At no point in the letter,

12

however, did Miyabe discuss mother's progress with respect to the domestic violence or child safety issues.

The cases are further distinguishable because they occurred at the 18-month status review hearing where the parents had completed case plans. Here, at the six-month review hearing, mother was still in the process of participating in, but had not completed, her individual counseling, a fact the juvenile court could have relied on in determining whether danger still existed.

Other facts also support the juvenile court's determination that returning the children to mother's custody would place them at substantial risk of detriment. For example, twice mother requested a welfare check on Z.N. from law enforcement when father canceled her visits. The Department asked mother not to use law enforcement to enforce visitation. Mother, however, remained adamant she would continue to do so in the future. On another occasion, father reported he received vulgar and lewd messages from mother's cell phone number. When the Department confronted mother about the messages, mother repeatedly denied sending them, but immediately changed her phone number.

Mother also points to her breakup with R.P. and his move to Philadelphia to further support her argument that substantial evidence did not support the finding the children would be at risk of detriment if returned to her custody. Specifically, mother argues any "theoretical risk" R.P., the perpetrator of Z.N.'s abuse, might pose could be "effectively neutralized" by continuing court supervision and returning the children to mother's care." Mother's argument fails to recognize the Department intervened not only because of the abuse R.P. perpetrated, but also because

mother failed to protect Z.N. and placed her other children at serious risk of physical harm by allowing R.P. to have access to them. Because mother had yet to address the issue of child protection in individual counseling, the juvenile court could have reasonably found mother needed time to complete individual counseling to understand she needed to protect her children from abuse.

Additionally, mother argues she met the case plan's objective requirements including parenting classes, individual counseling, and consistent visits. The Department does not dispute that evidence; as mother notes, the juvenile court recognized her substantial progress. Under our deferential review of the juvenile court's order, however, it is not our role to substitute our judgment for that of the juvenile court or to reweigh the evidence. (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1123.) Where, as here, there is substantial evidence to support the juvenile court's determination, we must conclude that the court did not abuse its discretion.

## II. The Juvenile Court's Articulation of the Factual Basis of Its Conclusion

Mother argues the juvenile court failed to specify the factual basis of its conclusion that the return of the children to mother would be detrimental.

### A. Applicable Principles

Section 366.21 provides that at the six-month review hearing, the juvenile court, after considering the admissible and relevant evidence, "shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of

14

the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1); see also § 366.21, subd. (f)(1) [same for 12-month review hearing].) The statute further requires the juvenile court to "specify the factual basis for its conclusion that the return would be detrimental or would not be detrimental." (§ 366.21, subd. (e)(2); see also § 366.21, subd. (f)(2) [substantively identical standard for 12-month review hearing].)

## B.  Analysis

Contrary to what mother now contends, the juvenile court did articulate a factual basis for its conclusion that returning the children to mother's custody would be detrimental. The juvenile court expressly found mother needed more time to complete her individual counseling. According to mother, the statement did not meet the requirement that the juvenile court specify the factual basis for its conclusion that the return of the children to mother would be detrimental under section 366.21, subd. (e)(2).

We disagree with mother. The juvenile court's articulation sufficed under the circumstances to satisfy the requirements of section 366.21. Insofar as mother now complains the juvenile court should have said more than it did, well-settled precedent holds a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been made in the trial court but was not. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; accord, *In re Alexandria P.* (2014) 228 Cal.App.4th 1322, 1346.) "Otherwise, opposing parties and trial courts would be deprived of opportunities to correct alleged errors, and parties and appellate courts would be required to deplete costly resources 'to address purported errors which could have been rectified in the

15

trial court had an objection been made.'" (*In re S.C.* (2006) 138 Cal.App.4th 396, 406.) For the sort of easily remedied procedural claim of error mother advances, invocation of forfeiture principles is particularly appropriate—and we therefore do so.

## II.    Reasonable Services

Mother argues the juvenile court lacked sufficient evidence in finding the Department provided or offered reasonable services because the first two individual counseling referrals it provided mother did not meet the case plan requirement. Moreover, she argues she would have completed her case plan if the Department had provided proper referrals.

At the six-month review hearing, the juvenile court must determine whether the Department has made reasonable efforts to provide reunification services to mother and the extent of her progress toward alleviating or mitigating the causes that led to the minor's detention. (§§ 366, subd. (a)(1)(B), 366.21, subd. (e)(8) [six-month review-reasonable services].) The Department "must make a good faith effort to provide reasonable services responsive to the unique needs of each family, and the plan must be . . . ""designed to eliminate those conditions which led to the juvenile court's jurisdictional finding."" [Citation.]" (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420 (*Patricia W.*).) "Services will be found reasonable if the Department has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.]" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972-973.) The adequacy of a reunification plan and the reasonableness of the Department's

16

efforts "are judged according to the circumstances of each case." (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345 (*Amanda H.*) [social services agency must make good faith effort to create and effectuate reunification plan].) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) The Department must show by clear and convincing evidence that reasonable reunification services have been provided. (In re *Monica C.* (1995) 31 Cal.App.4th 296, 306.)

We review a finding that reasonable services were provided for substantial evidence, considering the record in the light most favorable to the Department. (*Patricia W.,* supra, 244 Cal.App.4th at p. 419.) ""If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed.'" [Citation.]" (*Amanda H., supra,* 166 Cal.App.4th at p. 1346.) However, when the burden of proof at the trial court level is clear and convincing, the substantial evidence standard of review should account for the higher level of certainty demanded by that burden of proof, as compared to facts proven by preponderance of the evidence. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998-1006.)

Mother's argument that she would have completed her case plan if the Department had provided reasonable services, more specifically proper referrals, lacks support. The record shows the Department met with mother monthly and provided referrals on multiple occasions. Moreover, the Department was responsive

and provided referrals to mother when it discovered neither Howard nor Man fit the individual counseling requirement.[4]

As discussed above, mother encountered obstacles in obtaining appropriate individual therapy. The first delay, when the Department could not contact Howard, was caused by mother's failure to submit a release. The second delay appears to have occurred because mother waited three months to see Man after the Department told her Howard would not be a good fit. There is, however, nothing in the record to show the Department was responsible for any delay in mother obtaining individual counseling.

"In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect." (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 547.) However, "[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Ibid.*) Considering the record as a whole, substantial evidence supports the juvenile court's finding that the services were reasonable under the circumstances of this case as of the six-month review hearing.

---

[4]     We note the record does not reflect whether either Howard or Man was included in the Department's list of approved providers. In her briefs, mother does not claim either were included in the list.

**DISPOSITION**

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


CURREY, J.


We concur:


MANELLA, P.J.


WILLHITE, J.


19